**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| MUNICH REINSURANCE AMERICA, INC., | : | Civil Action No. 09-2598 (FLW) |
| | : | |
| Plaintiff, | : | |
| | : | **OPINION** |
| vs. | : | |
| | : | |
| | : | |
| TOWER INSURANCE COMPANY OF | : | |
| NEW YORK, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**WOLFSON, United States District Judge:**

This complex coverage dispute arises out of multiple reinsurance agreements between Plaintiff Munich Reinsurance American, Inc., formerly known as American Re-Insurance Company ("Plaintiff" or "Munich") and Tower Insurance Co. of New York ("Defendant" and "Tower"). In this suit, the parties have asserted claims against one another under these reinsurance and retrocessional agreements, wherein they essentially agreed to indemnify each other against all or a portion of the loss sustained under certain standard insurance policies. In the instant matter, Munich and Tower both move for partial summary judgment. Pursuant to the agreements, Munich seeks a past due payment of $3,287,597 and prejudgment interest. Tower seeks summary judgment on Munich's claims with respect to the Quota Share Agreements and Tower's counterclaim relating to the Multiple Line Excess of Loss Reinsurance Agreement ("XOL Agreement"). For the reasons that follow, Plaintiff's motion is granted in part and denied in part; in that, (1) the issue regarding the past

due payment is moot since Tower has already remitted payment; (2) Plaintiff is directed to submit a certification setting forth the appropriate prejudgment interest regarding the past due payment; and (3) Plaintiff's request for prospective relief in the form of an order directing Tower to cease its practice of withholding undisputed net balances due is denied.

Defendant's motion is also granted in part and denied in part; in that, (1) Munich's claim for recoupment of lead losses arising from the Quota Share Agreements is limited only to those claims that arise under polices issued after October 27, 1992; (2) summary judgment is denied with respect to the Baez Policy; (3) summary judgment on the loss adjustment expenses arising out of the Quota Share Agreements is denied; and (4) summary judgment on the Ling Ping claim is granted.

## I.    BACKGROUND

### A.    Overview

Before the Court recounts the facts of this case, due to the complexity of the reinsurance arrangement between the parties, I find it helpful to briefly summarize the structure of reinsurance in general:

> [P]rimary insurers themselves usually purchase insurance to cover a portion of the risk they assume from the consumer. This so-called "reinsurance" may serve at least two purposes, protecting the primary insurer from catastrophic loss, and allowing the primary insurer to sell more insurance than its own financial capacity might otherwise permit. Thus, "the availability of reinsurance affects the ability and willingness of primary insurers to provide insurance to their customers." Insurers who sell reinsurance themselves often purchase insurance to cover part of the risk they assume from the primary insurer; such "retrocessional reinsurance" does for reinsurers what reinsurance does for primary insurers.

Hartford Fire Ins. Co. v. Cal., 509 U.S. 764, 772-73 (1993).  Because these partial summary judgment motions only involve certain agreements between the parties, the Court will only provide

facts and the parties' respective positions relevant to those agreements.

In this case, Tower and Munich are domestic property and casualty insurance and reinsurance companies.  These two companies are parties to a series of reinsurance and retrocessional agreements.  Specifically, relevant to these motions, Munich reinsured Tower's underlying insurance obligations under a Quota Share Reinsurance Agreement covering the period 1992 through 1993 ("92/93 Quota Agreement"), see Contract No. 3812-0007, a Quota Share Reinsurance Agreement covering the period from 1994 to 2000 ("94/00 Quota Agreement") (collectively, "Quota Agreements"), see Contract No. 3812-0014, and XOL Agreement.

Each of the agreements between the parties explicitly provides that "[e]ach party [] has the right . . . to offset any amounts, whether on account of premiums or losses or otherwise, due from such party to another party," under either the same agreement or any other reinsurance agreement between them.  See, e.g., 94/00 Quota Agreement, Article XVI(a).  This type of "net" accounting was the way the parties reconciled their financial obligations to each other.  See Frawley Decl., ¶ 4.

### B.    Lead Warranty in the Quota Agreements

In the reinsurance industry, it is common practice for parties to prepare an outline of the terms of the agreed upon reinsurance, known as a "slip", with the expectation that the slip will be replaced with a more comprehensive contract.[1]  See Betiz Decl., ¶ 7.  Consistent with such practice, Munich and Tower prepared a slip for the 92/93 Quota Agreement and later replaced that slip with a written contract.  Notably, the 1992 slip did not contain a warranty requiring Tower to attach a lead exclusion to any policy it issued.  See Bell Dep., at 22-23.  In January 1993, the parties executed

---

[1] "A reinsurance slip is a contract, in abbreviated form, between the reinsured and the [reinsurer]."  Sphere Drake Ins. Ltd. v. American General Life Ins. Co., 376 F.2d 664, 670 n.4 (7th Cir. 2004).

3

another insurance slip, which contained all of the terms and conditions for the insurance agreement that the parties had agreed to as of that date. Id. at p. 22. Similar to the 1992 slip, the 1993 slip did not contain any provision requiring Tower to attach a lead exclusion to any policy it issued. Id. From 1992 through 1993, the parties' reinsurance relationship was governed by the 1992 and 1993 slips; the 92/93 Quota Agreement was not drafted and executed until August 2000. However, unlike the 1992 and 1993 slips, the 92/93 Quota Agreement contained a lead warranty provision which required Tower to include a lead exclusion endorsement to every commercial general liability ("CGL") liability it issued.

In or around 1993, Tower began reporting lead claims to Munich. However, Munich took the position that its reinsurance contracts generally did not provide coverage for lead claims. See Lee Aff., ¶ 3. Munich insisted that it has a long-standing policy against reinsuring an insurer's exposure for lead claims. See Beitz Dep., p. 197. However, according to Tower, the parties resolved their dispute and agreed that, on a going forward basis, Tower would include the lead exclusion in every CGL policy it issued. See Lee Aff., ¶ 3. In that regard, it is Tower's position that "at no time did [Tower] every knowingly warrant that it had attached and/or would continue to attach the Lead Exclusion to CGL policies issued prior to October 27, 1992 . . . ."[2] Id. at ¶ 5. At issue here is whether the inclusion of the lead warranty provision in the 92/93 Quota Agreement was the result of a mutual mistake.

---

[2] There is no dispute that Tower did not receive the requisite approval of the Insurance Department of the State of New York to use the lead exclusion until October 27, 1992. See Daddario Aff., Ex. B.

4

### C.    The Baez Claim

On September 28, 1994, the parties entered into the 94/00 Quota Agreement, which was in effect from 1994 to 2000.  This agreement included a lead warranty.  See 94/00 Quota Agreement, Art. XII(b) ("For every CGL policy issued by the Company, the Company warrants to the Reinsurer that they shall use the ISO CGL Coverage Form and shall include the ISO Total Pollution Exclusion Endorsement . . . and the Lead-Based Pain Exclusion Endorsement . . . .").[3]  Munich alleges that Tower breached the lead warranty provision of the 94/00 Quota Agreement by issuing a policy that provided lead coverage to Freddy and Zeneda Baez in 1999 (the "Baez Policy").  Tower contends that the Baez Policy is a commercial package peril policy ("CPP"), not a CGL policy.  Therefore, Tower insists that the lead warranty provision does not preclude coverage on this policy.

### D.    Loss Adjustment Expenses under the Quota Agreements

 In the early 1990s, Munich agreed to pay its proportionate share of the costs associated with Tower's claims and legal departments, i.e., Tower's loss adjustment expenses ("LAE") under the Quota Agreements.  Fauth Decl., ¶ 3. Throughout the 1990s, Tower billed Munich and Munich paid its proportionate share of Tower's LAE under the Quota Agreements.

In or about 1996, Tower Group, Inc. ("Tower Group"), parent company of Tower, formed Tower Risk Management ("TRM") to write insurance policies on behalf of certain companies (the "Front Companies") and to handle claims arising out of Tower policies that were reinsured under

---

[3]        There was a regulatory change, effective January 1, 1994, known as the "9 month rule" which required that a company could take credit on its financial statements only for reinsurance for which it had a contract signed within nine months of its effective date.  For this reason, Tower and Munich focused their attention initially on the drafting and execution of the 94/00 Quota Agreement.  Because the 92/93 Quota Agreement was not subject to the rule, the parties did not execute that agreement until August of 2000.  See O'Sullivan Aff., Ex. F.

the Quota Agreements. <u>See</u> Fauth Decl., ¶¶ 1,4. The same claims adjusters and attorneys who handled the claims under the Front Companies policies also handled claims under the Tower policies. <u>Id.</u> at ¶ 4. Because Munich reinsured the Front Companies with respect to the business underwritten by TRM, the TRM billings for insurance claims associated with that business were passed through to Munich. <u>See</u> Frawley Dec., at ¶¶ 2, 5. In the aggregate, the TRM billings, which included loss adjustment expenses TRM handled for Tower and the Front Companies, purportedly represented the total claim expenses of Tower Group. Fauth Dep., pp. 146-48; 157-58; 165-66; 190-92.

In the 92/93 and 94/00 Quota Agreements, the parties initially agreed in Article VII(b) that Munich will pay "in proportion to its participation expenses incurred by [Tower] in the investigation, adjustment and litigation of all claims under its policies, excluding the office expenses of Tower and the salaries and expenses of its officials and employees except for salaries of staff attorneys and claim personnel." In 2001, Tower Group asked Munich to amend this provision in order for Tower Group to better allocate TRM's billings between costs associated with the Front Companies and Tower. <u>See</u> Fauth Decl., ¶ 6. Munich agreed to the following alteration: Munich "shall bear in proportion to its participation expenses incurred by [Tower] in the investigation, adjustment and litigation of all claims under its policies, excluding the office expenses of the Company and the salaries and expenses of its officials and employees, except for the hourly billing of attorneys and claim personnel." Endorsement 008 to 94/00 Quota Agreement. In addition to the endorsement, the parties executed a letter of intent with the same revised language. <u>See</u> Letter of Intent dated February 5, 2001.

Consistent with the endorsement, Munich paid the LAE billings as they came due.

6

According to Munich, the billings that it received did not provide enough detail to enable Munich to compare the amounts being billed with Tower Group's actual claims expense as allocated by its Finance Department.  See Frawely Decl., ¶ 6.  In the course of discovery of this suit, Munich avers that Tower disclosed to Munich the internal documents evidencing the Tower Group's actual claims expenses as allocated by its Finance Department.  Id. at ¶ 7.  According to Munich, those documents reveal for the first time that TRM billings exceeded Tower Group's actual expenses from 2000 - 2007.  Id. at ¶¶ 7-8.  These LAE billings include both claim expenses to the Front Companies and to Tower.[4]  Munich contends that it never agreed to pay any loss adjustment expenses in excess of its proportionate share of Tower's actual expenses.  As a result, Munich seeks recoupment of the money it overpaid relating to the LAE billings.

## E.    The Ling Ping Claim

The details of the dispute arising from the Ling Ping Policy will be set forth more fully later in this Opinion.  For the purpose of this section, the Court notes that it is Tower's position that the XOL Agreement between the parties covers a property claim under a policy issued to Ling Ping Ltd. To counter, Munich argues that because Tower failed to timely send a notice of non-renewal to the insured and the Ling Ping claim occurred after the "natural expiration date" of the policy, Munich is not liable for the claim under the XOL Agreement.

## DISCUSSION

## I.    Standard of Review

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the

---

[4]      Munich explains that some portions of these "overbillings" were billed to reinsurers other than Munich, and thus, it cannot determine the precise amount that it has been overbilled by Tower.

facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319

8

(3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.    Plaintiff's Motion for Summary Judgment

Plaintiff moves for partial summary judgment on the net balance of $3,287,597 plus applicable pre-judgment interest, due from Tower under various reinsurance and retrocessional contracts.  In addition, Plaintiff requests the Court to order Tower to cease and desist its practice of withholding undisputed net balances due and to pay such balances immediately when due.  With respect to the net balance due, Defendant does not oppose Plaintiff's request.  By letter dated July 15, 2011, Tower has advised the Court that it has provided payment in the amount of $3,287,597 to Munich.  See Letter dated July 15, 2011.  In addition, Tower has no not opposed the imposition of any pre-judgment interest.  In that regard, Plaintiff's motion for summary judgment in this respect is granted.  Plaintiff is directed to submit an affidavit setting forth the appropriate pre-judgment interest no later than ten days from the date of the Order accompanying this Opinion.  Defendant is directed to submit a response, if any, five days thereafter.

With respect to Plaintiff's request to order Munich to cease withholding payments in the future, there is no basis at this juncture to grant such relief.  Plaintiff argues that there is strong

evidence supporting the need for the declaratory relief sought because for years Tower has withheld payments due Munich and it has done so without providing any lawful justification for the withholding.  However, the Court has no basis to grant such a prospective relief.  Rather, Plaintiff's remedy is to petition the Court in the event Tower inappropriately withholds any future payment thereby breaching the parties' agreements.  Accordingly, Plaintiff's request is denied.

III.    **Defendant's Motion for Summary Judgment**

A.    **Statute of Limitations**[5]

As a threshold matter, Tower argues in a cursory manner that any of Munich's claims relating to the breach of the Quota Agreements by Tower that are the subject of this motion should be barred by the six-year statute of limitations applicable to contract claims.  See N.J.S.A. 2A:14-1.  This contention is without merit.  First, as to the Baez claim, which is the only lead warranty claim at issue in this motion, it was not settled by Tower until 2006, four years before Munich filed suit.  See Frawley Decl., ¶ 15.  Thus, the statute of limitations did not begin to run until 2006.  As to the LAE claim, Munich become aware it had been allegedly overcharged during the course of this litigation - a fact which has not been disputed by Tower.  As such, pursuant to the discovery rule, the statute of limitations did not start to run until the course of this law suit, which was initiated in 2009.  Accordingly, the Court finds that the six-year statute of limitations does not bar any of Munich's claims that are the subject of this motion, i.e., claims related to the Quota Agreements.  Finally, to

---

[5]    The parties acknowledge that both New York and New Jersey may have an interest in having their state's law apply to the issues presented in this matter.  However, the Court finds, and the parties have so agreed, that, for the purposes of these motions, there are no conflicts of law between the laws of New York and New Jersey.  Accordingly, because of this lack of conflict, the Court will only cite to New Jersey law. See Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615 (2007) (if no conflict exists, the court applies the law of the forum state and ends the conflict inquiry).

the extent Munich's claims of equitable recoupment are related to the claims at issue in these motions, the are also not barred by the six-year statute of limitations.  See Beneficial Finance Co. of Atl. City v. Swaggerty, 86 N.J. 602, 609 (1981) (quoting Bull v. United States, 295, U.S. 247 (1935)) ("[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.").

### B.      Lead Warranty in the 92/93 Quota Agreement

Tower contends that because the lead warranty provision in the 92/93 Quota Agreement was erroneously incorporated, it is entitled to reform the agreement based upon a mutual mistake of the parties, and in that regard, Munich's claims for recoupment should be denied.  The Supreme Court of New Jersey has delineated general principles for contract interpretation and reformation:

> As a general rule, courts should enforce contracts as the parties intended. Similarly, it is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties. The Court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose.

Pacifico v. Pacifico, 190 N.J. 258, 266 (2007) (internal citations and quotation marks omitted).  In furtherance of binding contracting parties to their mutual intent, "a court may reform a contract if it 'was created by the negotiations of the parties, but by mutual mistake is wanting in formal expression or execution, so as to evince the actual intent of the parties.'"  Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc., – F.3d 225 – , No.10-3833, 2011 U.S. App. LEXIS 15894, at *13-14 (3d Cir. Aug.3, 2011)(citing Gross v. Yeskel, 100 N.J. Eq. 293, 134 A. 737, 737 (N.J. Eq. 1926) (internal citations omitted)).

In other words, in New Jersey, an unambiguous contract may be reformed when there is

mutual mistake and the written contract does not match the parties' original intent. Cent. State Bank v. Hudik-Ross Co., Inc., 164 N.J. Super. 317, 324 (App. Div. 1978) ("The rule that contracts may be reformed where there has been mutual mistake is 'well settled in our jurisprudence.'"). A mutual mistake is "1. A mistake in which each party misunderstands the other's intent . . . [or] 2. A mistake that is shared and relied on by both parties to a contract." Wyndham, 2011 U.S. App. LEXIS 15894 at *14-15 (quoting Black's Law Dictionary 1023 (8th ed. 2004)).

In ascertaining whether a mutual mistake exists, courts evaluate the understanding of the parties at the time the contract was formed. Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 608 (1989). A party seeking reformation for mutual mistake must show that both parties labored under the same misapprehension as to a particular and essential fact. Id.  The understanding of persons who were not contracting parties at the time of consummation of a contract is irrelevant. Gross, 134 A. at 737 (stating that courts should only look at the intent of the contracting parties at the time of consummation of a contract); Sav. Inv. & Trust Co. v. Conn. Mut. Life Ins. Co., 17 N.J. Super. 50, 56 (Ch. Div. 1952) ("Equity, in an effort to effectuate the intent of contracting parties, will exercise its power to reform instruments where there has been a mutual mistake of the parties.").

Here, to support its position that a mutual mistake exists regarding the lead warranty in the 92/93 Quota Agreement, Tower first argues that the 1992 and 1993 slips, which governed the parties' reinsurance relationship for eight years until the 92/93 Quota Agreement was executed in August 2000, did not contain the lead warranty.  However, the slips themselves do not provide any basis for the Court to find that the parties intended the provisions of the 92/93 Quota Agreement to reflect the same terms contained in the slips.  Indeed, when comparing the terms of the Agreement and the slips, there are substantial differences.  In fact, in the reinsurance industry, the very purpose

12

of a slip is to merely outline the terms of the agreed upon reinsurance with the expectation that the slip will be replaced by a more comprehensive contract thereafter.  See Beitz Decl., ¶ 7.  In that regard, it is common that the contract's terms will sometimes vary from the terms outlined in the slip.[6]  Id.  More importantly, Mr. Lee, the president of Tower, who signed the 92/93 Quota Agreement, acknowledged that in or around 1993,Tower began reporting lead claims to Munich, and during that time Munich took the position that its reinsurance contracts did not provide coverage for lead claims.  Lee Aff., ¶ 3.  As a result, Tower threatened to terminate the parties' contracts.  Id.  However, the parties agreed that on a going forward basis, Tower would include the lead exclusion in every CGL policy it issued.  Based upon Mr. Lee's testimony, Munich did not have an intention at that time to exclude a lead warranty in the 92/93 Quota Agreement.

Significantly, Mr. Lee does not expressly state that the warranty language was mistakenly included in the 92/93 Quota Agreement, but rather, he did not agree that the warranty should apply retroactively to policies issued prior to October 27, 1992.  See Lee Aff., ¶¶ 5-6.  On this point, Lee stated that Tower "would not have knowingly agreed to retroactively warrant that it had attached the Lead Exclusion to any policy issued prior October 27, 1992 because, if it had done so, [Tower] would have deliberately: (a) put itself in breach of that warranty with respect to every policy issued prior to that date, (b) subjected itself to liability with respect to any lead claims that had already been submitted, or would be submitted in the future, under such policies, and (c) obligated itself to take action in violation of the New York State insurance regulations."  Id.  Seemingly, implicit from that statement, the Court finds that Tower had agreed to apply the lead warranty only to policies issued

---

[6]       As with the 92/93 Quota Agreement, the slip which proceeded the 94/00 Quota Agreement did not contain a reference to a lead warranty; however, ultimately, the parties included a lead warranty provision in the 94/00 Quota Agreement.

after October 27, 1992, the date the exclusion was approved for use. This interpretation is consistent with Munich's understanding with regard to the effect of the lead warranty in the 92/93 Quota Agreement. As such, the Court limits Munich's claim for recoupment of lead losses only to those claims that arise under polices issued after October 27, 1992.[7]

C.      The Baez Claim

Munich alleges that it is entitled to recoup amounts that it has previously paid, and/or not pay amounts owing in the future on the Baez Claim, because Tower issued the Baez Policy in violation of the lead warranty provision in the 94/00 Quota Agreement. The lead warranty provision provides that "[f]or every CFL policy issued by [Tower], [Tower] warrants to [Munich] that they shall use the ISO CGL Coverage form (CG 001 1188) and shall include the ISO Total Pollution Exclusion Endorsement (CG2149 1188) and the Lead-Based Pain Exclusion Endorsement (TOWL-1)." See 94/00 Quota Agreement, Article XII. Consistent with that language, Tower argues in response that because the lead warranty only applies to CGL policies, the Baez claim, under a CPP Policy, should not be excluded by the warranty.

In support of Tower's argument, Tower points to the depositions of David Domino, former vice president of American Re-Insurance Co. ("American") and Thomas Bell, former executive vice president of American, wherein they stated that CPP policies are different than CGL policies. See Bell Dep., at p. 56; Domino Dep., at pp. 50-51. At the outset, the Court notes that Tower has not attached a copy of the Baez Policy to its motion for summary judgment. Tower explains that it

_____

[7]      Indeed, Tower has expressly stated that all the lead claims that have been billed under the 92/93 Quota Agreement arose under policies that were issued prior to October 27, 1992. In that respect, Tower, in its reply brief, concedes that the issue regarding the wording of the 92/93 Quota Agreement is mooted by Munich's position.

14

cannot locate the policy and as a substitute, Tower attaches a series of endorsements, renewal and change forms to that policy.  See O'Sullivan Aff., Ex. J.  As a result, it is difficult for the Court to determine the exact nature of the Baez Policy.

With respect to Tower's argument that CPP policies are different from CGL policies, Munich responds through its Vice President of Treaty Underwriting, Daniel Beitz, that a CPP policy is a collection of two ore more coverage types or forms, one of which can be a CGL form.  See Beitz Decl., ¶ 9.  Beitz explains:

> [Tower] is an "ISO company", meaning that it uses insurance policy forms developed by the Insurance Services Office, or "ISO."  Each such ISO form has a particular form number.  It is my understanding that companies using ISO forms of the type used by [Tower] typically prepare a CPP policy using the same forms, called monoline forms, that would be used if an insured had separately purchased each type of coverage.  Thus, a CPP policy is really just a package of monoline forms for each coverage type selected by the insured.  If the insured selected comprehensive general liability as part of the package, then the CGL policy form used would be the standard ISO form used by that company.

Id.  This explanation is consistent with Tower's understanding.  Tower's Vice President of Underwriting, Josephine Saenz-DeViteri, testified at her deposition that a lead exclusion is typically attached to a CPP policy having a CGL component.  See Saenz-DeViteri Dep., pp. 176-77; see also September 2002 email from Ms. DeViteri (confirming the importance of attaching lead exclusion to all CPP policies, as well as other forms of policies issued by Towers).  Indeed, the issue here is whether the Baez Policy included any CGL coverage.

The depositions of Mr. Bell and Mr. Domino do not shed light on this issue.  Rather, both were merely asked whether CPP policies are different from CGL policies.  See Bell Dep., at p. 56; Domino Dep., at pp. 50-51.  As to that question, Mr. Bell answered that the lead warranty is limited to Tower's CGL policies and no other policies.  Id.  However, Mr. Bell did not testify as to whether

a lead exclusion form must be included in a CPP policy which contains CGL coverage. Likewise, Mr. Domino only stated that a CPP policy is different than a CGL policy. Id. Neither witness testified specifically regarding the Baez Policy, and more importantly, whether that policy contained CGL coverage.

Based on the record before the Court, Tower has not provided any basis for the Court to find that the Baez Policy did not include CGL coverage. Indeed, having reviewed the endorsements and renewal forms to the Baez Policy, the Court cannot conclude that the Baez Policy did not contain a CGL component. Therefore, there is an open factual issue as to the nature of the Baez Policy, and accordingly, Tower's motion for summary judgment in this respect is denied.

### D.   LAE Overbilling Claim

As previously noted, the relevant language of the LAE Endorsement provides that Munich "shall bear in proportion to its participation expenses incurred by [Tower] in the investigation, adjustment and litigation of all claims under its policies, excluding the office expenses of the Company and the salaries and expenses of its officials and employees, except for the hourly billing of attorneys and claim personnel." Endorsement No. 8.

Under this language, Munich argues that it is not obligated to pay its proportionate share of all of the TRM billings where the total TRM billings, i.e., both claim expenses for the Front Companies and Tower policies exceeded the actual expenses incurred by Tower Group. However, Munich's argument takes into account the total actual expenses incurred by Tower Group, not Tower. Clearly, under the unambiguous language of the endorsement, Munich agreed to bear in proportion of claim expenses incurred by Tower, not its parent company, Tower Group. In its opposition, much of Munich's financial evidence focuses on the total claim expenses for Tower

16

Group. Critically, according to James Frawley, the Manager of the Account Services Department for Munich, the total claim expenses he examined were Tower Group's actual claim expenses, not those of Tower. See Frawley Decl, at ¶ 8. Indeed, the TRM billings examined by Frawley constituted claim expenses from the policies of the Front Companies and Tower, not Tower's alone.

Moreover, Tower acknowledges that Munich's argument obfuscates the distinction between the claim expenses of Tower and Tower Group. See Tower's Reply, p. 6. Accordingly, based upon the record before the Court at this time, the Court cannot differentiate the claim expenses incurred by Tower from those expenses incurred by the Front Companies in order to assess Tower's actual expenses. This is not to say that there may not be instances where overbilling could have occurred; rather at this juncture, the Court does not have a sufficient basis to conclude whether overbilling in fact occurred during the years of 2000 - 2007. The Court's finding of insufficient evidence may impact Tower's defenses pursuant to the doctrine of laches, accounted stated doctrine and waiver and therefore, Tower is permitted to raise these defenses at a later time. In that regard, Tower's summary judgment on this issue is denied without prejudice; the parties may move for relief with an appropriate record.

### E.     The Ling Ping Claim

One of Tower's counterclaims alleges that Munich refuses to reimburse Tower for $41,507.56 under the XOL Agreement for a property claim under the Ling Ping Ltd. The Ling Ping Policy was in effect from January 1, 2004 to August 1, 2004. At the time of renewal, Tower determined that it would not renew the policy. However, as Tower has admitted, a notice of non-renewal was untimely sent to the insured. Fauth Decl., ¶ 16. Because of the delay, Tower was required by the insurance laws of New York to continue coverage under the Ling Ping Policy until

August 12, 2004.  Id.  On August 9, 2004, there was a fire at the insured's premise that resulted in a claim under the Ling Ping Policy.  According to Tower, this claim triggered an excess of loss reinsurance under the XOL Agreement.

The relevant terms of the XOL Agreement are as follows:  Addendum No. 2 to the XOL Agreement terminated the reinsurance coverage applicable to the Ling Ping Policy effective January 1, 2004.  However, the Addendum states that "all risk bound under the terms of the [reinsurance coverage] which are in effect as of said date shall remain in force until cancellation or natural expiration thereof."  Addendum No. 2, Section II.  According to Munich, this form of termination is known as termination on a "run-off basis."  Indeed, as is apparent from the face of addendum, the run-off termination provides that reinsurance remains in effect for policies in force on the date of termination, i.e., January 1, 2004, through their cancellation or natural expiration.  According to those terms, since the Ling Ping Policy took effect on January 1, 2004, the XOL Agreement provided reinsurance coverage for the Ling Ping Policy until that policy was cancelled or until it expired.  , Munich explains that based upon the language of the "run-off" termination, "Tower apparently elected to ensure that the Ling Ping Policy did not extend beyond its natural expiration, but failed to take timely action and as a consequence had to extend the policy beyond the period of its actual expiration to give effective notice of non-renewal."  Opp. Brief, p. 16.  Munich argues that the loss in question occurred during this extended period, and therefore, outside the period of the reinsurance coverage.  The Court disagrees.

Addendum No. 2 specifically states that the termination of coverage was "in accordance with the terms of the COMMENCEMENT AND TERMINATION Article" of the XOL Agreement.  See Addendum 2, Section II.  Paragraph D of the XOL Agreement, entitled Commencement and

Termination Article, provides that:

> Notwithstanding the foregoing, in the event the Company is required by statute, regulation or by order of any court or regulatory authority to (i) continue a policy or Policies subject hereto in force . . . after termination the Reinsurer agrees to extend reinsurance coverage hereunder with respect to such policy or Policies until the Company may legally cancel, non-renew or otherwise eliminate its liability under such policy or Policies.

XOL Agreement, Art. XVII(D). Based upon that unambiguous language, Munich is obligated under these terms to pay losses arising after the Ling Ping Policy's natural expiration where Tower is required by statute or regulation to continue that policy.

Notwithstanding the unambiguous language of the Article, Munich contends that Tower was required by New York insurance laws to extend the Ling Ping Policy because Tower, through its own negligent conduct, failed to timely issue a notice of non-renewal. In that respect, Munich maintains that Paragraph D was not intended to apply to relieve Tower from its own negligence. Contrary to Munich's position, however, the plain language of the provision does not provide a negligence exception. Instead, Munich is inviting the Court to insert such an exception into Paragraph D when in fact the parties did not intend to include such a term. Critically, Mr. Beitz, Munich's Vice President of Treaty Underwriting, admitted in his deposition that Paragraph D requires Munich's reinsurance coverage to "respond" where Tower did not "non-renew within a certain period of time" and is then "required to statute or regulation . . . to remain on a policy." Beitz Dep., pp. 149-150. More importantly, Mr. Beitz testified that "[a]ccording to this [Paragraph D] wording," there are no limitations to Munich's obligation to continue providing insurance coverage in the event Tower was required by statute to continue the policy until Tower could legally cancel it. Id. at p. 150.

19

Having considered the language of the XOL Agreement and the testimony of Beitz, the Court finds that the XOL Agreement provides coverage to the Ling Ping claim, and in that regard, Tower is entitled to summary judgment as to this counterclaim.

## CONCLUSION

For the reasons set forth herein, the Court concludes that Plaintiff's motion is granted in part and denied in part in the following manner: (1) the issue regarding the past due payment in the amount of $3,287,597 is moot since Tower has already remitted payment; (2) Plaintiff's request for prospective relief in the form of an order directing Tower to cease its practice of withholding undisputed net balances due is denied; and (3) Plaintiff is directed to submit a certification setting forth the appropriate prejudgment interest.  In that connection, Plaintiff is directed to submit an affidavit setting forth the appropriate prejudgment interest no later than ten days from the date of the Order accompanying this Opinion.  Defendant is directed to submit a response, if any, five days thereafter.

Defendant's motion is granted in part and denied in part in the following manner: (1) Munich's claim for recoupment of lead losses arising from the Quota Share Agreements is limited only to those claims that arise under polices issued after October 27, 1992; (2) summary judgment is denied with respect to the Baez Policy; (3) summary judgment on the loss adjustment expenses arising out of the Quota Share Agreements is denied; and (4) summary judgment on the Ling Ping claim is granted.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: December 22, 2011