*NOT FOR PUBLICATION*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MUNICH REINSURANCE AMERICA, INC., | : : : : | |
| Plaintiff, | : | Civil Action No.: 09-CV-2598-FLW |
| v. | : : : | **OPINION** |
| TOWER INSURANCE COMPANY OF NEW YORK, | : : : | |
| Defendant. | : : | |

WOLFSON, United States District Judge:

Plaintiff Munich Reinsurance America, Inc., formerly American Re-Insurance Company, ("Plaintiff" or "Munich"), and Tower Insurance Co. of New York ("Defendant" and "Tower"), each present a discrete legal issue in the form of competing motions *in limine* asking which party bears the burden of establishing the extent of Tower's obligation to indemnify Munich for certain lead claims under the parties' 1998 retrocessional insurance agreement. Considering the plain language of the parties' agreement, along with the applicable canons of insurance contract construction, I conclude that the burden falls upon Tower.

I.      BACKGROUND

As the parties are familiar with the factual background of this matter, I will recount only those facts necessary for disposition of the instant motions *in limine*. Generally, this suit arises out of multiple reinsurance agreements between Munich and Tower, through which agreements the parties agreed to indemnify each other against all or a portion of the loss sustained under certain

standard insurance policies.  The policy at issue here is a 1988 retrocessional agreement.[1] *See* McNally, Exh. C.

Through the retrocessional agreement, Tower reinsured Munich in connection with Munich's role as a reinsurer for Legion Insurance Company—a commercial and residential property insurer. *See id.*, Exh. F.  Legion acted as a "front company" for Munich, which means that Legion's name was placed on the front page of certain insurance policies issued, but 100% of the risk underlying those policies was passed upstream to Munich as Legion's reinsurer.  Fauth Dep. at 15:2 - 16:19. *See generally* 2 Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 21.04[f] (14th ed. 2008) (hereinafter "Ostrager") (describing fronting reinsurance agreements).  "In a fronting arrangement—a well-established and perfectly legal scheme—policies are issued by a state-licensed insurance company and then immediately reinsured to 100 percent of their face value by the out-of-state, unlicensed insurer." *Reliance Ins. Co. v. Shriver, Inc.*, 224 F.3d 641, 643 (7th Cir. 2000).  *See also Venetsanos v. Zucker, Facher & Zucker*, 271 N.J.Super. 459, 463-64 (App. Div. 1994).  By virtue of the Munich-Legion agreement, all losses on the policy were payable by Munich and, consonant with that obligation, Munich took over the administration of all claims presented under the agreement.

Article II of the retrocessional agreement addresses what claims are covered by the agreement and the extent to which Tower is obligated to indemnify Munich for claims paid under the Munich-Legion agreement, which is referred to as the "Underlying Agreement."  As the following excerpt makes clear, the percentage amount Tower must pay varies depending upon which

---

[1] For a description of retrocessional agreements, see my prior ruling in *Munich Reinsurance America, Inc. v. Tower Ins. Co. of New York*, Civil Action No. 09–2598, 2011 WL 6756937, *1 (D.N.J. Dec. 23, 2011).

2

part of Article II applies to a given set of claims. The article, as a whole, provides:

> COVER
>
> The limits of cover are provided in three parts, which are set forth below in the order in which [MUNICH] shall make its recoveries hereunder.
>
> Part I
>
> [MUNICH] shall cede to TOWER and TOWER shall accept from [MUNICH] quota share reinsurance participation equal to 100% of the Aggregate Net Losses paid by [MUNICH] under the Underlying Agreement with respect to business classified under the specified categories, risks, hazards, and coverages set forth in Appendix I of this AGREEMENT.
>
> Part II
>
> TOWER shall be liable for 100% of that amount of the Aggregate Net Losses paid by [MUNICH] under the Underlying Agreement in excess of the following amounts, after deducting recoveries under Part I of this Article:
>
> Casualty     $1,000,000 per policy, per occurrence
> Property     $1,000,000 per risk, per occurrence
>
> Part III
>
> [MUNICH] shall cede to TOWER and TOWER shall accept from [MUNICH] a ten percent (10%) quota share participation in the Aggregate Net Losses paid by [MUNICH] under the Underlying Agreement, after deducting any amounts recovered under Parts I and II of this Article.

McNally Cert., Exh. C at 2.

The Appendix I referred to in Part I of Article II sets forth the categories of claims that are covered at a 100% participation rate, including title insurance claims, advertising injury claims, and, relevant here, lead claims. According to paragraph 4 of Appendix I,

> 4.   All claims arising from lead [are covered] unless

3

>   (a) such claims arise under policies written on behalf of the LEGION by the Tower Risk Management Corporation[2] under the LEGION's Preferred Habitational Insurance Program, in accordance with the underwriting guidelines for said Program where said underwriting guidelines have been agreed to by [MUNICH]; or
>
>   (b) such claims arise under policies which have been individually submitted by TOWER to [MUNICH] for inclusion hereunder and specially accepted by [MUNICH].

*Id.* at Appendix I, p.1. So, for those claims that do not fit within the criteria set forth in paragraph 4(a) or (b), the Part I 100% quota share rate applies. But, for those claims do fit within the paragraph 4(a) or (b) criteria, the Part I 100% quota share rate does not apply.

As noted, the parties bring their dispute before this Court by way of motions *in limine*. That is, each party simultaneously filed a moving brief in support of its own motion and, thereafter, filed an opposition brief responding to the other's party moving papers. The parties agreed to this method of presenting their dispute in the Final Pretrial Conference held before the Honorable Lois Goodman, U.S.M.J., on May 30, 2012. As memorialized in the Final Pretrial Order, the parties specifically agreed that the motions would be filed in an expedited fashion with a return date of July 16, 2012. Final Pretrial Order at 1. The remaining motions *in limine* are not due to be filed until August. Apparently, the reason for the expedited motion schedule is that both parties believed that an early ruling on the burden of proof issue would be helpful to them. Thus, I have expedited my review of their arguments in order to issue an Opinion as quickly as possible.

---

[2] I need not explain the role of Tower Risk Management Corporation, as it does not affect my *in limine* ruling, but suffice it to say that this corporation is separate from Tower, and it appears to have served as an intermediary for the Munich-Legion arrangement. *See* Final Pretrial Order at 14; *see generally* Ostrager, *supra* at §15.04[c] (describing reinsurance intermediaries).

II.     DISCUSSION

Interpretation of an insurance contract or policy is a matter of law for the Court. *Sealed Air Corp. v. Royal Indemn. Co.*, 404 N.J.Super. 363, 375 (App.Div.), *certif. denied,* 196 N.J. 601 (2008).[3] Generally, "[i]nsurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement 'will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled.'" *Memorial Properties, LLC v. Zurich American Ins. Co.*, --- N.J. ----, 2012 WL 2428196, *6 (2012) (quoting *Flomerfelt v. Cardiello*, 202 N.J. 432, 441, 997 A.2d 991 (2010)). In construing the terms of a policy, courts are to give the terms their plain and ordinary meaning. *Id.* It is only where a contract's language is ambiguous that a court may rely upon extrinsic or parol evidence to determine the intent of the parties; where the language of the contract is clear, extrinsic evidence may not be considered. *Chubb Custom Ins. Co. v. Prudential Ins. Co.*, 195 N.J. 231, 238 (2008) ("If the language is clear, that is the end of the inquiry.")

While these general canons of construction may have been developed in the context of direct insurance contracts, they are equally applicable to reinsurance and retrocessional agreements. Ostrager, *supra* at §15.03[b]. That said, "[r]einsurance [agreements] vary considerably in their language and terms of coverage." *Id.* Thus, while my analysis will be guided by the aforesaid general principles of insurance law, my ultimate determination must rest on the plain language of the parties' retrocessional agreement.

---

[3] Munich relies upon both New Jersey and New York law in its briefing, noting that Tower has suggested that New York law governs the interpretation of the retrocessional agreements. However, in its moving and opposition papers, Tower cites solely to New Jersey law. Accordingly, as Tower has not argued for the application of New York law in its papers, the Court will assume for purposes of this motion that New Jersey law applies.

It is helpful to clarify at the outset what the parties do *not* dispute. The parties do not dispute that Tower is obligated to pay Munich on the Part I lead claims, and that the quota share reinsurance participation on those claims is typically 100% . They further agree that the only instances in which Tower is not obligated to pay 100% is where either of the criteria in Appendix I, paragraph 4 apply.

What the parties' dispute centers upon is which party bears the burden of demonstrating that either criterion applies. Munich argues that Tower bears the burden of establishing that either criterion applies by analogizing Tower to an insurer seeking the benefit of a policy exclusion in a direct insurance policy. "Exclusionary clauses are . . . typically construed narrowly with the onus on the insurer to bring the case within the exclusion." *Memorial Properties,* 2012 WL 2428196 at *7. Tower advocates an entirely different approach, arguing that the retrocessional agreement is, at its core, a 10% quota share participation agreement and that, consequently, the lead clause itself should be treated as an exclusionary clause. Under this view, Munich would bear the burden of proof as it seeks the benefit of the 100% exclusion.

Tower may be correct that many claims within the scope of the retrocessional agreement might be paid at a 10% rate. The agreement provides that "[t]he limits of cover are provided in three parts, which are set forth below in the order in which [MUNICH] shall make its recoveries hereunder." Immediately thereafter, Part I sets forth the lead and other specified claims to which the 100% quota share reinsurance participation rule applies. Part II of the agreement generally provides that the 100% quota share reinsurance participation rule also applies to large casualty or property claims exceeding $1,000,000 per policy and per occurrence. Progressing forward, Part III of the agreement contemplates 10% quota share reinsurance participation for what remains "after deducting any amounts recovered under Parts I and II ...." McNally Cert., Exh. C at 2. Hence,

6

depending on how many claims fall within the bounds of Parts I and II, there could be a significant amount of payments made under Part's III 10% rule.

Whatever the rate applicable to the bulk of Munich's claims under the agreement, all lead claims clearly fall under Part I unless one of the exceptions found in paragraph 4 of the Appendix applies. Because paragraph 4 is a definitional provision that specifically designates lead claims as within the category of claims arising under Part I, I reject Tower's invitation to treat this lead provision as some sort of exclusion. Read together, the plain language of both Part I of Article II and paragraph 4 of Appendix I makes clear that the parties intended for Tower to accept 100% quota share reinsurance participation from Munich on "[a]ll claims arising from lead, *unless*" the two criteria listed in paragraph 4 apply. *Id.* at Appendix I, p.1. Thus, as Munich argues, the only provisions in the agreement with an exclusionary effect are the criteria found in paragraph 4(a) and 4(b).

Taking issue with this conception of the policy, Tower further argues in its opposition papers that paragraph 4(a) and (b) cannot be treated as exclusions because they are found within the "coverage" section of the agreement. Tower argues that "[t]he term 'coverage' . . . connotes a distinct part of an insurance policy providing the policyholder with insurance as to a defined risk or risks coming within its terms." *Delcampo v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 266 N.J.Super. 687, 700 (Law Div. 1993). Relying on this definition, perhaps inaptly so because this definition refers to statutory rather than policy language, *see id.* at 700-01, Tower suggests that Part I of the agreement and paragraph 4(a) and (b) together comprise a coverage provision and that all clauses within a coverage provision must be proven by the insured.

The New Jersey Supreme Court has squarely rejected this sort of formalistic approach to

interpreting insurance policy language. In *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 154 N.J. 312 (1998), the Court explained:

> [E]xclusions do not shed their essential character when they are moved from one section of a policy and are crafted as part of that policy's grant of coverage. We therefore decline to adopt a rule of law governing burden of proof the application of which would depend merely on the location of a provision in an insurance contract.

*Id.* at 332.

In reaching this conclusion, the Court made clear that courts are to focus on "the effect or character of [a] phrase," and where the language behaves like "an exclusion of the coverage grant by the very operation of its terms," the insurer should bear the burden of proving the phrase's application. *Id.* at 331 (quoting *Clemco Indus. v. Commercial Union Ins. Co.*, 665 F.Supp. 816, 820 (N.D.Cal. 1987), *aff'd* 848 F.2d 1242 (9th Cir. 1988)).[4] Indeed, "[i]f an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering of the burden of proof would be limited to the single section entitled, 'Exclusions,' this would create considerable incentive to obfuscation and subterfuge." *Andover Newton Theological School, Inc.*

---

[4] For example, in *First Trenton Indem. Co. v. River Imaging, P.A.*, 2009 WL 2431649 (App. Div. Aug. 11, 2009), the Appellate Division relied upon *Carter-Wallace* in the following passage addressing a provision with exclusionary effect in a Zurich policy.

> General Condition V.C. is in form a coverage provision rather than an exclusion. However, Zurich invokes this provision as an exclusion from coverage for any claims arising out of the 'same wrongful act' or 'interrelated wrong act' as a claim originating in a prior policy period. *Therefore, Condition V.C., like Endorsement 8 and Exclusion No. IV.A.1, must be treated as an exclusion with respect to which Zurich has the burden of proof.*"

*Id.* at *4 (citing *Carter-Wallace*, *supra* at 332) (emphasis added). While this non-precedential New Jersey Appellate Court decision is not binding, I consider it persuasive authority for the proposition that New Jersey courts continue to view *Carter-Wallace* as binding authority.

*v. Continental Cas. Co.*, 964 F.2d 1237 (1st Cir. 1992) *cited with approval in Carter-Wallace*, 154 N.J. at 331.

Reading the plain language of the parties' retrocessional agreement with New Jersey's practical approach to interpreting language with an exclusionary effect, I conclude that the burden of proving that the paragraph 4(a) and (b) criteria apply falls upon Tower in its role as reinsurer of the Munich-Legion agreement. In light of my conclusion that the plain language of the agreement is clear, I may not consider the extrinsic evidence cited by Tower in its opposition brief. Nor need I consider Tower's equitable arguments for why the burden of proof should shift to Munich. As Tower acknowledges in its papers, I cannot rewrite the parties' agreement but must enforce its plain terms. *See* Tower Opp. at 4 (citing *CSFB 2001-CP-4 Princeton Park Corporate Center, LLC v. SB Rental I, LLC*, 410 N.J.Super. 114, 120 (App. Div. 2009)). *See also Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 43 (1960) ("[I]t is the function of a court to enforce it as written and not to make a better contract for either of the parties").

Lastly, Tower somewhat confusingly argues that "because the shifting of the burden of proof to Tower requires the weighing of evidence, it is inappropriate on a motion *in limine*, and must await trial." Tower Opp. at 8. This argument is confusing because, from what I understand of the parties' discussions with the Magistrate Judge, and in seeing that Tower itself filed papers in support of one of the instant motions *in limine*, it appears that Tower not only agreed to proceeding by way of motion *in limine*, but went so far as to request that the Court consider this matter in an expedited fashion. Now, for Tower to argue that the motion *in limine* vehicle is inappropriate is perplexing

if not disingenuous.[5]  More importantly, as noted, the interpretation of an insurance contract or policy is a matter of law for the court to decide. *Sealed Air Corp.*, 404 N.J.Super. at 375. And, because I have concluded that the plain language of the agreement is unambiguous, there is no "weighing of evidence" that need take place here. Therefore, I disagree with Tower that the motion *in limine* vehicle is inappropriate in this case.

III.   CONCLUSION

For the foregoing reasons, Plaintiff's motion *in limine* requesting that the Court rule that Tower bears the burden of proof on the legal issue set forth herein is GRANTED. Defendant's motion *in limine* is DENIED.


DATED:     July 16, 2012


/s/ Freda L. Wolfson
United States District Judge

---

[5] I appreciate that Tower apparently obtained new counsel following the Final Pretrial Conference. However, rather than seeing this as a justification for Tower's contradictory positions before this Court, I presume that new counsel sufficiently apprised itself and was aware of the prior counsel's representations to the Magistrate Judge as well as the terms of the Final Pretrial Order. Certainly, new counsel is bound by the representation of prior counsel.